# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DERRICK LASHAN HILL, | ) Case No.:12-cv-00504-AWI-DLB (HC) |
| Plaintiff, | ) FINDINGS AND RECOMMENDATION |
| | ) REGARDING PETITION FOR WRIT OF |
| vs. | ) HABEAS CORPUS |
| | ) |
| CONNIE GIPSON, | ) [Doc. 1] |
| | ) |
| Defendant. | ) |

Petitioner is proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Petitioner filed the instant petition for writ of habeas corpus on April 3, 2012. Respondent filed an answer to the petition on July 10, 2012, and Petitioner filed a traverse on August 2, 2012.

## STATEMENT OF CASE AND FACTS[1]

[Petitioner] Derrick Lashan Hill was convicted of numerous crimes arising from a murder and home invasion robbery.  [N.1]  He appealed to this court and we remanded the matter to the trial court for an evidentiary hearing on the issue of jury misconduct.  In addition, we ordered the court to amend the abstract of judgment if it denied the motion for new

[1] The factual and procedural background is taken from the opinion of the state appellate court and is presumed correct. 28 U.S.C. § 2254(e)(1).

1

trial after the evidentiary hearing.  The trial court held an evidentiary hearing where all jurors and alternates were questioned.  The court denied the trial court's ruling denying his motion for new trial and amended the abstract of judgment.  [Petitioner] appeals the trial court's ruling denying his motion for new trial based on juror misconduct asserting it was erroneous on multiple grounds.  We disagree and affirm the judgment.

[N. 1]  We have taken judicial notice of the record in [Petitioner's] prior appeal, (*People v. Hill* (July 9, 2009, F054334) [nonpub. opn.] (*Hill*)).

[Petitioner] was charged with murder of Sebastian Caradonna by personal use of a firearm during the course of a robbery (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17) & 12022.53, subd. (b)).  He was also charged with two counts of robbery by personal use of a firearm: the robbery of Sebastian Caradonna and the robbery of Veronica Caradonna (Pen. Code, §§ 211 & 12022.53, subd. (b)).  It was further alleged he had a prior serious felony conviction within the meaning of the "Three Strikes" law (Pen. Code, §§ 1170.12, subds. (a)-(d) & 667.5, subd. (b)-(i)).

The Caradonnas ran a cleaning service from their home.  In 2006, they paid their employees in cash.  In January 2006, Ceona Ashley Harvey worked for them for about a week.  The Caradonnas were planning to switch from cash payments to checks beginning the first week of February.  During the brief time Harvey worked for them, she asked a fellow employee, Ruben Perez, if Sebastian Caradonna had a safe and how much money be carried.

On Tuesday, February 1, 2006, sometime around 10:00 p.m.., [Petitioner] and a male accomplice, wearing masks and carrying guns, accosted three employees who had just arrived at the Caradonna residence to get their supplies and instructions for the evening.  The Caradonnas and their two children were inside the house. [Petitioner] and his accomplice forced the employees into the house, robbed the Caradonnas, and shot and killed Sebastian.

[Petitioner] and Harvey were originally charged as codefendants in the information.

Their trials were subsequently severed and the trial on Harvey's case concluded prior to the trial on [Petitioner's] case.

In [Petitioner's] trial, evidence linking him to the commission of the crimes was found in the call detail records from Cricket Communications for Harvey's and [Petitioner's] cellular phones.  The records showed 14 calls exchanged between the two between January 20, 2006, and January 30, 2006.  On January 30, 2006, the night before the murder, two calls from [Petitioner's] cellular phone were made to Harvey's cellular phone.  Those calls were picked up by Cricket tower E2444.  Tower E2444 was the Cricket tower located closest to the Caradonnas' residence.  On the date of the murder, six calls were exchanged between the two cellular phones.  The last one was at 8:58 p.m. and was from Harvey to [Petitioner].  The Cricket tower [Petitioner's] cellular phone

used to receive the call was near the Caradonnas' residence.  After the murder, from February 2, 2006, to February 4, 2006, [Petitioner] and Harvey exchanged 11 calls. Evidence was presented explaining that only connected calls are recorded in the records and that cellular phone calls are, 90 percent of the time, picked up by the nearest cellular telephone tower.  If issues such as cellular telephone traffic, structures, foliage, or other obstructions came into play, a call could go to the next closest tower; but, a wireless telephone consultant testified that 10:17 p.m. on a Tuesday is not a high traffic time for cellular telephone usage and, in the specific area the crimes occurred, there were no obstructions that would interfere with a call.  The consultant opined there was a 99.9 percent certainty that a call in that area would go to the nearest tower.  An independent consultant in the telephone industry testified for [Petitioner] regarding the circumstances under which a call might not go to the nearest tower, but agreed that most calls normally do go to the nearest tower.

[Petitioner] was convicted of first degree murder and two counts of robbery.  The jury found true the special circumstance of murder committed during the course of a robbery and, as to each count, that [Petitioner] personally used a firearm.  [Petitioner] admitted the alleged prior serious felony conviction.  [Petitioner] subsequently moved for a new trial based on juror misconduct.  He raised three concerns regarding the jurors' conduct. First, he asserted jurors discussed the case while the trial was in progress and before deliberations began.  Second, he claimed a juror did weekend Internet research on the use of cellular telephone records, printed out an article, brought it into the jury room, and discussed it with other jurors.  Third, he asserted newspaper articles regarding the trial were brought into the jury room, passed around, and discussed.  The trial court declined to call jurors and question them on the issue of misconduct.  Instead, it gave [Petitioner] the benefit of the doubt on all assertions.  [Petitioner's] motion was denied.

In his first appeal, [Petitioner] raised numerous errors.  We found error, in part, in the hearing on the issue of juror misconduct.  As to two of the claims of misconduct, we found they did not result in a showing of jury bias, and failed to meet the standard that would require a new trial.

Regarding the first claim, the article on cellular telephone records obtained by Internet research, we stated, "The evidence at trial regarding cellular telephone records was extensive, with an expert for the People and an expert for the defense discussing how cellular telephone calls can be traced to a particular area.  Both experts agreed that normally a cellular telephone call will bounce off the closest tower unless there is interference based on terrain, physical barriers, or call traffic at the time the call is placed. The article did not contradict this testimony."  (*Hill*, *supra*, F054334.)

The second claim involved the discussion of the case by jurors before deliberations began, and we found that, without more details as to the extent of the discussions or the nature of the discussions, the allegations did not warrant a new trial.

However, as to the third claim of misconduct, [Petitioner's] assertion regarding the newspaper article, we determined more inquiry needed to be made.  The article at issue stated, toward the end, "'Authorities said Hill knew about Caradonna's business from Ceona Ashley Harvey, who had worked there briefly.  Hill and Harvey knew each other through the marriage of relatives.  [¶]  Harvey was convicted of first-degree murder in March for helping Hill plan the robbery.  She was sentenced the following month to life in prison without the possibility of parole.'"  (*Hill*, *surpa*, F054334.)  We found, "The evidence presented in this trial to link Harvey to the murder was that she had worked for the Caradonnas, she knew [Petitioner], she asked another employee about how much money Sebastian carried, and she exchanged several telephone calls with [Petitioner] in the days leading up to and following the murder, including the one telephone call the night before the murder that was recorded on the cellular tower near the Caradonnas' residence.  The focus of the evidence at this trial was not on Harvey; Harvey's statements (admitted at her trial) were not admitted at [Petitioner's] trial.  In the trial of [Petitioner], the evidence that Harvey was directly involved in the murders was not particularly strong, yet the article informed the juror(s) who read it that Harvey had been convicted of first degree murder.  Thus, the jury was aware that a codefendant, linked to the crime in a much less significant way than the current [Petitioner], had already been found guilty.  Even more injurious is the portion of the article that states she was found guilty for helping [Petitioner] plan the robbery, directly imputing her guilt as arising from [Petitioner's] involvement and clearly inferring that she merely helped [Petitioner]."  (Hill, supra, F054334, fn. Omitted.)  We held that, "[t]he article stating that Harvey was previously convicted of first degree murder for helping [Petitioner] plan the robbery, when judged objectively, is inherently and substantially likely to have influenced a juror." (*Ibid.*)

We remanded the matter to the trial court for a new evidentiary hearing on the motion for new trial based on juror misconduct.  In doing so, we found the People and [Petitioner] were entitled to a full evidentiary hearing to determine the truth or falsity of the allegations.  We stated, "[s]hould the credible evidence demonstrate misconduct and prejudice, the People have the burden to rebut prejudice.  Although we have found the evidence of the cellular telephone articles and discussion by jurors of the case outside of deliberations to not amount to prejudicial misconduct on the record before us, if further evidence relating to these two areas of misconduct is … developed and found credible at the evidentiary hearing, the trial court should then reassess the prejudice in light of the new evidence."  (*Hill*, *supra*, F054334.)

 On remand, [Petitioner] asked the trial court to question each juror and alternate juror individually out of the presence of the other jurors.  He argued the jurors would be less intimidated by other jurors and more forthright in their answers if the questioning was done this way. [N.2]

[N.2] Unless stated otherwise, when we refer to the "jurors" we are referring to the 12 jurors and the two alternates combined.

The trial court denied [Petitioner's] request stating, "it had the issue of credibility of the jurors to consider and could better make that determination by listening carefully to the juror who was speaking, watching the reaction of the other jurors as well as the demeanor of and observing the body language of the speaker and the other jurors at the same time. Another consideration by the Court was to have the two jurors who initially approached defense counsel with the possible misconduct issue and filed affidavits, present their issues in the presence of all the jurors who could hear firsthand what the accusations were and to have the opportunity of an immediate response rather than have the Court or the attorneys explain what the two jurors in question had testified to with the strong possibility of unintentional misstatements or misquotes."

The jurors, with the exception of Juror No. 12, were brought into and remained in the courtroom together where they were questioned individually. [N.3]

[N.3] Juror No. 12 could not be located when the jurors were summoned to appear in court. No. 12 was questioned at a later date.

Each juror was asked a series of questions. No. 12 was asked the same questions on a later date. Each juror was asked if the juror discussed the case with nonjurors prior to deliberations. Alternate No. 2. stated there was a discussion among two or three people while they were waiting for the shuttle to arrive. When Alternate No. 2 told them they should not discuss the case, the discussion stopped. Alternate No. 2 also said the conversation at the shuttle stop did not concern the guilt or innocence of [Petitioner]. All the other jurors either said there was no discussion, or did not recall a discussion, or could not remember a discussion of the case with nonjurors. [N.4]

[N.4] Many times defense counsel would not ask a straightforward question such as, "Did you discuss the case with other jurors outside of deliberations?" Counsel instead would ask, "Do you recall or remember discussing the case outside of deliberations?" When a juror responded no to the second type of question, it was not clear if the response meant the juror did not recall discussing the case outside of deliberations because in fact he or she did not discuss the case with other jurors, or the juror did not have a recollection of whether he or she discussed the case with other jurors. This type of questioning continued throughout the proceedings.

The jurors were asked if the case was discussed with other jurors before deliberations. No. 5 stated they talked regarding the procedure of the case, but did not discuss facts. All the other jurors either said there was no discussion, or they did not recall a discussion, or could not remember a discussion of the case with other jurors.

The jurors were asked if they did any Internet research regarding the case during the trial. All the jurors said they did not do Internet research, or did not recall doing Internet research, or could not remember doing Internet research. None of the jurors said they did Internet research relating to the case during the trial.

Jurors were asked if they recalled anyone bringing in the results of Internet research concerning the case.  No. 5 said someone brought in an Internet article that had something to do with cellular phone towers and a lot of jurors got to see it.  No. 5 thought there might have been a discussion regarding the Internet article.

No. 11 stated someone brought in pieces of paper from Internet research and said they found some "stuff" on cellular phone towers.  The person put the papers on the table, but no one got excited and jumped to read it, the article was "sort of dismissed."  The papers were merely sitting on the table.

Alternate No. 2 said someone put papers on the table from the Internet.  Alternate No. 2 did not pay attention to what it was and did not remember anyone having a discussion about the papers.

All the other jurors did not see or hear of Internet research, or did not recall seeing or hearing of Internet research, or did not remember Internet research.  In addition to questioning by counsel, the court asked the jurors as a group if anyone discussed anything about cellular phone towers that was not presented as evidence in the case.  None of the jurors replied to the court's question.

Jurors were asked if they saw a newspaper in the jury room, if they read a newspaper article in the jury room, and if they saw others reading a newspaper in the jury room.  Juror Nos. 2, 5, 7, 8, 11, 12, and Alternate Nos. 1 and 2 said they saw newspapers in the jury room.  No. 2 did not remember if the paper was present on more than one day or if the paper was passed around.  [N.5]

No. 5 stated there were a couple of times when newspapers were brought into the jury room and the person with the newspaper was reading it.  No. 5 said one article in the newspaper was passed around during deliberations.  No. 5 said the headline was about this case, but No. 5 did not remember the rest of the article.  No. 5 thought people might have discussed the article, but No. 5 could not "100 percent recall 100 percent what was discussed."  No. 5 saw the headline of the article and read the first two or three sentences of the newspaper article before placing it back on the table.  No one read the article out loud but someone said "they're talking about our trial."  No. 5 did not recall having a discussion about the article with any other jurors, but said other jurors picked up the newspaper.  According to No. 5, the newspaper was folded in such a manner that you could see the article about the case as the paper was on the table.

No. 7 recalled that there was a newspaper on the table more than once, but did not remember anyone looking at articles.  No. 7 did not hear anyone discuss the newspaper article concerning the case.

No. 8 recalled seeing a newspaper in the jury room once or twice.  No. 8 saw other jurors looking at the sales or sports in the newspaper.  No. 8 said the sports section was the only

part personally read in the newspaper.  No. 8 did not recall anyone discussing information from the newspaper.

It was reported by No. 11 that there was a newspaper in the jury room one time, but the juror did not remember what was in the newspaper and remembered only that it was at the end of the table.  No. 11 did not see an article regarding the case inside the jury deliberations room and did not hear any discussion regarding such an article.

Newspapers were seen by No. 12 on one day, there was no discussion of the newspaper, and No. 12 recalled seeing the horoscope page.

Alternate No. 2 saw a paper on the table in the deliberation room once, but did not see anyone reading it, and did not recall anyone discussing anything they had read in the newspaper.

The remaining jurors said they did not see a newspaper in the jury room and did not hear any discussion of newspapers, or did not recall, or did not remember if this occurred.

The court asked the jurors as a group (except for No. 12) if anyone discussed information about the case that was not presented as evidence in the trial.  No one responded to the question.

After the parties submitted written arguments and made oral arguments to the court, the court denied the motion and issued a lengthy written opinion explaining its rationale.

On the issue of whether jurors discussed the case outside of deliberations, the court found any discussion was brief in nature and the evidence of discussion by jurors did not amount to prejudicial misconduct.

The court considered the issue of Internet research being conducted by a juror and being brought into the jury deliberation room.  It noted that no juror admitted to conducting the research and bringing it into the jury room.  The court went on to find the misconduct of bringing the material into the jury room was not prejudicial, noting that the article was similar to, and did not contradict, the testimony given at trial.  The court found there was no juror bias, as there was no evidence that any jurors read the research, and no reasonable probability of prejudice.

Regarding the newspaper article, the court found No. 5 was the only juror who testified as to the specific presence of an article regarding the case.  The court went on to find that No. 5 made contradictory statements between the declaration presented at the motion following the trial and at the current hearing on matters that were significant and not easily forgotten.  The court found No. 5's testimony to be inconsistent and equivocal when compared to the statements made in No. 5's declaration.  In addition, the testimony of No. 5 was directly and unequivocally refuted by the testimony of the remaining jurors.  "The Court finds that in weighing the credibility of the testimony there is simply no

credible evidence to support the allegation of juror misconduct to wit the reading and discussion of any article about the case. The lack of credibility undermines the allegation of misconduct."

The court went on to state that even if the court found No. 5's testimony credible that No. 5 read the first few sentences of the newspaper article, this was not prejudicial misconduct because the first few sentences of the article contained an accurate account of what had occurred at trial.

The court denied the motion for new trial and amended the abstract of judgment as directed by this court.

(LD 4 at 1-10.)

DISCUSSION

I.      Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008 (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

///

///

///

II.   <u>Standard of Review</u>

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of [the Supreme] Court." <u>Harrington v. Richter</u>, __ U.S. __, 131 S.Ct. 770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412 (2000). Habeas relief is also available if the state court's decision "involved an unreasonable application" of clearly established federal law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. <u>Richter</u>, 131 S.Ct. 785 (citing 28 U.S.C. § 2254(d)(1), (d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court decision." <u>Williams v. Taylor</u>, 529 U.S. at 412. Therefore, a "specific" legal rule may not be inferred from Supreme Court precedent, merely because such rule might be logical given that precedent. Rather, the Supreme Court case itself must have "squarely" established that specific legal rule. <u>Richter</u>, 131 S.Ct. at 786; <u>Knowles v. Mirzayance</u>, __ U.S. __, 129 S.Ct. 1411, 1419 (2009). Moreover, the Supreme Court itself must have applied the specific legal rule to the "context" in which the Petitioner's claim falls. <u>Premo v. Moore</u>, __ U.S. __, 131 S.Ct. 733, 737 (2011). Under § 2254(d)(1), review is limited to the record that was before the state court adjudicated the claim on the merits. <u>Cullen v. Pinholster</u>, __ U.S. __, 131 S.Ct. 1388, 1398

(2011).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991).  However, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  Richter, 131 S.Ct. at 784.

III.   Juror Misconduct Claims Based on Internet Research/and Exposure to Newspaper Article

In Grounds 1, 3, and 4 of the Petition, Petitioner challenges the state court's determination that the Internet research and newspaper article that were brought in the jury room were not inherently prejudicial, and claims the presumption of prejudice that arose from such exposure was rebutted by a showing of bias.  More specifically, Petitioner contends the juror's misconduct and exposure to outside information violated his constitutional rights to cross-examination, counsel, and right to confrontation.  Because all three of these claims challenge the same juror conduct and potential prejudice, the Court finds, as the appellate court did, these claims should be analyzed together.

In denying this claim on direct appeal, after remand, the California Court of Appeal, Fifth Appellate District held as follows[2]:

> [Petitioner] makes a multifaceted attack on the ruling of the trial court.  First, [Petitioner] argues the court misstated facts.  In particular, he argues the court misstated facts when it said that all jurors except No. 5 testified that they did not see or read any newspaper articles.  [Petitioner] points out that the jurors' responses were more equivocal and some did not remember or recall.  [Petitioner] also faults the court for not giving proper deference to the passage of two years between the trial and the hearing on jury misconduct.  It is argued that these factors undermine the trial court's decision.
>
> As previously noted, the phrasing of some of defense counsel's questions resulted in ambiguous responses.  The trial court was in the best position to interpret these responses. We do not find the trial court misstated facts, but merely interpreted answers to reach its conclusion.  "[A]n appellate court will accept the trial court's credibility determinations and findings on questions of historical fact if they are supported by substantial evidence." (*People v. Nesler* (1997) 16 Cal.4th 561, 589.)
>
> While there was a passage of time, there is nothing in the decision of the trial court to demonstrate the court discounted it and, in fact, the trial court noted the passage of time when discussing the statements made by No. 5 and found that these statements were significant and would not be easily forgotten, even with the passage of time.
>
> Next, [Petitioner] argues the findings of the trial court were undermined by the refusal to conduct individual questioning of the jurors in camera and, instead, holding the hearing with the simultaneous presence of all the jurors (except No. 12).  He contends this undermined the accuracy, reliability, and truthfulness of the evidentiary hearing.
>
> Appellate counsel states he could not find any cases on point, but argues the jurors were witnesses, and rules of exclusion should have been granted based on the motion made by defense counsel at the hearing.
>
> There is case authority on this point.  Individual questioning of jurors regarding an allegation of juror misconduct is not constitutionally required.  (*People v. Pinholster* (1992) 1 Cal.4th 865, 927-928.)  "Certainly, when there is a claim of juror misconduct, the court must conduct 'an inquiry sufficient to determine the facts . . . whenever the court is put on notice that good cause to discharge a juror may exist.'  [Citation.]  But failure to conduct a sufficient inquiry is ordinarily viewed as an abuse of discretion, rather than as constitutional error.  [Citation.]"  (*Id.* at p. 928.)  The state's high court in

---

[2]  Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. at 804-05 & n. 3.

*Pinholster* added, "While individual questioning may have been preferable, we have never held that it is constitutionally required."  (*Ibid*.)

We fail to see a distinction between questioning jurors during trial regarding jury misconduct, and questioning them after the trial has concluded as part of a motion for new trial.  In each instance, the court is trying to determine if misconduct occurred and has the discretion to conduct the hearing in the best manner it sees fit.  Thus, it is permissible for the trial court, in the exercise of its discretion, to question the jurors as a group.  The trial court here stated it was exercising its discretion when it ordered group questioning and stated reasons to sufficiently support its discretionary decision.

. . . . . . . .

[Petitioner] argues one of the jurors committed perjury because it was established that a juror conducted Internet research and brought it into the jury room, yet none of the jurors admitted to doing so.  It is claimed that his behavior resulted in a showing of presumed/implied bias and reversal is required.

In *People v. Blackwell* (1987) 191 Cal.App.3d 925, a juror intentionally concealed her background regarding domestic violence on voir dire in a case involving the shooting of the victim based on a claim of battered women's syndrome resulting from domestic violence perpetrated on the defendant by the victim.  It was found that the juror committed misconduct and the misconduct was prejudicial because the juror later stated she felt the defendant should have resolved the situation in the same manner the juror resolved her domestic violence situation, without the resort to violence.  The appellate court found the concealment by the juror, which they characterized as perjury, was misconduct prejudicial to the defendant.  "Intentional concealment of relevant facts or the giving of false answers by a juror during the voir dire examination constitutes misconduct [citations], and the occurrence of such misconduct raises a rebuttable presumption of prejudice.  [Citations.]  Prejudicial jury misconduct constitutes grounds for a new trial."  (*Id*. at p. 929.)

 That a juror lied in this case is jury misconduct.  Such misconduct raises a rebuttable presumption of prejudice.  We do not believe, however, that the fact that a juror lied about conducting Internet research establishes bias.  It is more likely that the juror who did the research in this case recognized the wrongfulness of the conduct, and was merely afraid or embarrassed to come forward and admit the transgression.  This does not equate to a bias against [Petitioner], particularly when the Internet materials, as previously found by this court, did not contradict the evidence received at trial.  Additionally, there was no evidence here that the juror who did the research was influenced by it, or tried to sway other jurors based on the extrajudicial information the juror obtained.  (*See People v. Nesler*, *supra*, 16 Cal.4th at pp. 588-589.)

As his final assertion [Petitioner] claims that because a juror did Internet research and kept it secret throughout the trial he was deprived of his right to confront the article's

author and the author's sources to test their opinions on cross-examination.  He argues his
constitutional rights to confrontation, cross-examination, and counsel were violated.
Even if we were to assume [Petitioner's] constitutional rights were violated, [Petitioner]
has failed to show prejudice.  As previously determined by this court, the content of the
Internet article would not have prejudiced [Petitioner].

(LD 4 at 12-13.)

"In all criminal prosecutions," state and federal, "the accused shall enjoy the right to …

trial … by an impartial jury," U.S. Const. amends. VI and XIV; see Duncan v. Louisiana, 391

U.S. 145 (1968); Irvin v. Dowd, 366 U.S. 717, 722 (1961).  The United States Supreme Court

has stated, "[i]mpartiality is not a technical conception.  It is a state of mind.  For the

ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no

particular tests . . ." United States v. Wood, 299 U.S. 123, 145-146 (1936).  Therefore, trial

courts are given broad discretion in determining whether a jury can be impartial, and such

findings of impartiality will be overturned only when prejudice is manifest." Irvin v. Dowd, 366

U.S. at 723.

The right to a trial by impartial jury "means a jury capable and willing to decide the case

solely on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217 (1982).  Determinations

regarding a juror's impartiality may be made, as they were in this instance, at a hearing in which

the trial court assesses the impact of the information wrongfully obtained and whether it was

prejudicial. Remmer v. United States, 347 U.S. 227, 229-230 (1954); Smith, 455 U.S. at 217.

"Juror misconduct typically occurs when a member of the jury has introduced into its

deliberations matter which was not in evidence or in the instructions." Thompson v. Borg, 74

F.3d 1571, 1574 (9th Cir. 1996).  "Jury exposure to facts not in evidence deprives a defendant of

the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth

Amendment. Lawson v. Borg, 60 F.3d 608, 612 (9th Cir. 1995).  However, habeas corpus relief

is available to the petitioner only if the constitutional error prejudiced him such that it "had

'substantial and injurious effect or influence in determining the jury's verdict.'" Id. at 612, (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 & n.9 (1993)).

As set forth above, in this case the appellate court determined juror misconduct occurred. One juror conducted Internet research that had not been admitted at trial, specifically, an article regarding records of cellular phone towers being in criminal prosecutions. Assuming that the juror's behavior was constitutionally cognizable misconduct, see Turner v. Louisiana, 379 U.S. 466 (1965), the question is then whether the misconduct had a "substantial and injurious effect" on the jury's verdict. Brecht v. Abrahamason, 507 U.S. at 623, 631. The Court is mindful of the fact that factual findings arising out of the state courts' post-trial hearings are entitled to a presumption of correctness. See 28 U.S.C. § 2254(d); Sumner v. Mata, 449 U.S. 539 (1981); Wainwright v. Witt, 469 U.S. 412, 426-430 (1985). Thus, they must be determined, in the first instance, by state courts and deferred to, in the absence of "convincing evidence" to the contrary, by the federal courts. Marshall v. Lonberger, 459 U.S. 422, 432 (1983). Here, both the state's trial and appellate courts concluded that the juror's misconduct was not prejudicial. This finding of "fact"-on a question the state courts were in a far better position than the federal courts to answer-deserves a "high measure of deference," Sumner, 455 U.S. at 598, and may be set aside only if it "lack[s] even 'fair support' in the record. Marshall, 459 U.S. at 432.

On remand, the trial court conducted a hearing as ordered by the appellate court. The trial court examined every juror, including the two alternates, weighed their answers and observed their demeanor to determine whether there was actual or implied bias. The trial court's investigation was reasonable and revealed no prejudice. The appellate court reviewed the trial court's ruling and also concluded that Petitioner was not prejudiced in light of the content of the material. The appellate court reasonably concluded "there was no evidence … that the juror who did the research was influenced by it, or tried to sway other jurors based on the extrajudicial information the juror obtained." (LD 4 at 12-13.) The appellate court also found that the

Internet article did not contradict the extensive expert testimony on cellular telephone records, and such finding was certainly reasonable.  See RT 906-934 [prosecution expert testimony by Jim Cook, a wireless consultant, regarding the use of cell phone towers to pinpoint an individual's location]; RT 1098-1121 [defense expert testimony by Allan Thompson, independent consultant, regarding various factors which contribute to pinpointing individual's location by use of cell phone towers.]  Given the content of the material and the extent of the misconduct, it could not have had a substantial and injurious effect on the jury's verdict, and the Court concludes the state court's decision concerning the lack of prejudice from the juror's misconduct was not contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d).

IV.   Appellate Court's Application of Law of the Case Doctrine

In Ground 2 of the Petition, Petitioner contends the appellate court erred by refusing to reassess the issue of prejudice based on the juror's Internet research as well as alleged discussions by jurors prior to deliberations under the law of the case doctrine.

On direct appeal in case number F054334, the California Court of Appeal found no prejudice regarding these two instances stating:

> "'[W]hen misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial.  The verdict will be set aside only if there appears a substantial likelihood of juror bias.  Such bias can appear in two different ways.' ([*In re Carpenter* (1995) 9 Cal.4th 634, 653 (*Carpenter*).]

> "'First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror.' (*Carpenter*, *supra*, 9 Cal.4th at p. 653.) 'Under this standard, a finding of "inherently" likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment.  Application of this "inherent prejudice" test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information.'" (*Ibid.*)

"Second, 'even if the extraneous information was not so prejudicial, in and of itself, as to cause "inherent" bias under the first test,' the nature of the misconduct and the 'totality of the circumstances surrounding the misconduct must still be examined to determine objectively whether a substantial likelihood of actual bias nonetheless arose.' (*Carpenter*, *supra*, 9 Cal.4th at pp. 653-654.)  'Under this second, or "circumstantial," test, the trial record is not a dispositive consideration, but neither is it irrelevant.  All pertinent portions of the entire record, including the trial record, must be considered. "The presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual"' bias.  (*Id*. at p. 654)" (*People v. Danks* (2004) 32 Cal.4th 269, 303.)

The article stating that Harvey was previously convicted of first degree murder for helping [Petitioner] plan the robbery, when judged objectively, is inherently and substantially likely to have influenced a juror.

We do not find that the same holds true for the article printed from the Internet regarding the use of cellular telephone records to convicted defendants.  The evidence at trial regarding cellular telephone records was extensive, with an expert for the People and an expert for the defense discussing how cellular telephone calls can be traced to a particular area.  Both experts agreed that normally a cellular telephone call will bounce off the closet tower unless there is interference based on terrain, physical barriers, or call traffic at the time the call is placed.  The article did not contradict this testimony.  For example, the article stated that "[i]n urban areas crowded with cell towers, the records can pinpoint someone's location within a few blocks."  While the receipt of this evidence was misconduct, a review of the entire record demonstrates this misconduct alone does not result in a showing of juror bias.

In addition, the allegation of jury misconduct that one or more jurors discussed the case before deliberations began, when made without more details as to the extent of the discussions or the nature of the discussions, fails to meet the standard requiring a new trial.

. . . Although we have found the evidence of the cellular telephone articles and discussion by jurors of the case outside of deliberations to not amount to prejudicial misconduct on the record before us, if further evidence relating to these two areas of misconduct is further developed and found credible at the evidentiary hearing, the trial court should then reassess the prejudice in light of the new evidence . . . .

(LD 12, at 17-18, 24-25.)

On appeal after remand in case number F059656, the California Court of Appeal refused to reconsider the issue of prejudice as to the cellular phone article and pre-deliberation discussion stating the following:

Next, [Petitioner] asserts that when this court considers the issue of jury misconduct, it is not bound by law of the case.  In our previous opinion, we considered the prejudice flowing from each of the three instances of misconduct and directed the trial court to reassess the prejudice from the Internet research, as well as the alleged discussions by jurors before deliberations, if further evidence relating to these two areas was developed. There was no further evidence developed at the hearing on these two issues, and we will not reconsider the prejudice because we have already done so.

(LD 4 at 11-12.)

The law of the case doctrine precludes a court "from reconsidering an issue previously decided by the same court, or a higher court in the identical case." United States v. Lummi Indian Tribe, 235 F.3d 443, 452 (9th Cir. 2000).  The doctrine is discretionary, not mandatory, but "the prior decision should be followed unless: '(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial.'" In re Rainbow Magazine, 77 F.3d 278, 281 (9th Cir. 1996), quoting Heglar v. Borg, 50 F.3d 1472, 1475 (9th Cir. 1995).

The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  As just stated, the appellate court initially determined that the cellular phone article and pre-deliberation discussions did not result in prejudicial misconduct.  On appeal after remand, the appellate court found there was no further evidence of juror misconduct presented at the evidentiary hearing.  Therefore, there was no need, based on the law of the case, to reassess whether the misconduct resulted in prejudice to Petitioner.  Accordingly, Petitioner's claim is without merit and habeas corpus relief is foreclosed.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be DENIED; and

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   __**August 20, 2012**__            _____/s/ *Dennis L. Beck*_____
                                                              UNITED STATES MAGISTRATE JUDGE